## MOSTERTZ v. QUAKER PILE FABRIC CORPORATION.

### No. 9321.

District Court, E. D. Pennsylvania.
Aug. 21, 1937.

T. Bertram Humphries, of Philadelphia, Pa., for plaintiff.

Henry N. Paul, Jr., and Wallace D. Newcomb, both of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a suit in equity for infringement of U. S. letters patent No. 1,934,942 to Mostertz, granted November 14, 1933.

The patent has to do with a large class of woven fabrics known as loop pile fabrics. These fabrics are made by using an extra set of warp yarns which are woven into a relatively tight backing in such fashion that the extra warps will stand up in a series of loops. Loop pile fabrics are used commercially for Turkish towels, face cloths, bath rugs, Astrachan and other textile or imitation furs, upholstery and no doubt for many other purposes.

The alleged infringing fabrics are loop pile fabrics of a particular type called frisé (also apparently spelled frieze), and are used for upholstery. The patent does not limit its scope to any one variety, but relates generally to all loop pile fabrics.

There are six claims, of which the last is a method or process claim. It need not be considered separately, because it does not specify any particular method of weaving but consists in dyeing the fabric described in the preceding claims. A typical claim is claim 1, which is as follows:

"A loop pile fabric having loops formed of a yarn composed of both vegetable and animal fibre threads, the vegetable fibre threads in each of said loops being matted down and the animal fibre threads therein standing more erect."

Claims 3 and 4 are broader, both of them eliminating the matting down of vegetable fibre threads. Claim 4 describes the animal fibre threads as "projecting beyond the vegetable fibre threads." Claim 3 merely describes the yarns as, "reacting differently to the application of moisture." Claims 2 and 5 describe the animal fibre threads as, "twisting" and, "twisted upon themselves." These last two claims are open to the serious criticism that, if they mean a complete turn or twist as illustrated in figure 3 of the patent, they call for a result which never occurs in practice, and consequently are not infringed.

It must be emphasized at the outset that this patent has nothing to do with the method of weaving. The specification says, "the invention is in no way limited to the manner of weaving." It applies to all loop pile fabrics—a broad class of weaves, long well-known and in general use. The only thing by way of manufacturing which the patent even purports to add to the prior art is the idea of making the loop yarns of a combination of vegetable and animal fibre threads. Loops of this kind, the patent says, upon being dyed, produce a fab-ric in which the animal threads stiffen and tend to stand up in little peaks and the vegetable threads relax and slump down or mat around them. This is the essence of the patent—a fabric (1) in which the loops are composed of composite yarns, animal and vegetable (2) having a surface which presents tips of animal yarn rising above a groundwork of vegetable threads.

Now, it is admitted that there is nothing new about the idea of using composite yarns of animal hair and cotton to make the loops in a loop pile fabric, and it goes without saying that a yarn partly composed of cotton is much cheaper than a yarn entirely composed of mohair—the animal material ordinarily used in these fabrics.

The patentee in his testimony, in endeavoring to show what novel and useful result was accomplished by his patent, specified a number of advantages which it had over the all-mohair fabrics of similar weave, formerly used in frisé for upholstery. But, if these "advantages" be carefully examined, it will be seen that most, if not all of them, arise from the mere introduction of cotton into the loop yarn and do not at all depend upon the characteristic structure which he claims for the finished product. Thus the quality of being less irritating to the skin is entirely due to the presence of cotton, and, if anything, would be defeated or lessened by having mohair points standing up. That the fabric weaves easier because it is lighter in weight and is easier to repair if it breaks in weaving, is due to the same thing. The possibility of producing a two color effect certainly is nothing new and cannot be claimed as any peculiar advantage. Resistance to attacks by moths is also undoubtedly due to the presence of cotton. It takes quite a flight of fancy to attribute this quality to the structure of the cloth by suggesting that the larvae of moths do not eat the mohair because they like to burrow down between the points of the loops where it is warm and dark and where they find only cotton and consequently die of starvation and discouragement. All these so-called advantages can be obtained by introducing a certain amount of cotton in any manner into any mohair fabric.

The real advantage, of course, of this fabric is that by using cotton threads you can get a cheaper fabric, having whatever useful qualities the cotton can give it, which looks something like the more expensive

all-mohair and wears fairly well. In other words, as one of the witnesses, a dyer, said, referring to the instructions which the defendant gave him in making out the alleged infringement, "Make a dollar fabric look like a five dollar one."

There is little doubt that the motive, at least, in getting out this type of frisé was to cheapen the material without too greatly impairing its usefulness. The whole record indicates that the plaintiff, finding a demand for something cheaper than the all-mohair frisé, adopted the obvious expedient of adulterating the mohair pile loops with cotton; that having done so, he noted certain structural features of the new fabric which, microscopically examined, were different from the old; and that he thereupon set about giving it an air of patentable novelty by endowing it with a lot of qualities, some of which may have been useful and desirable, but all of which were inherent in the substitute material itself and had nothing to do with the claimed new structure of the finished product.

■ But merely substituting cheaper material in an old and well-known structure is not invention. It was well-known that cotton and mohair react differently to dyeing, and the resultant fabric is what anyone skilled in the art would have expected as soon as he had undertaken to cheapen his product.

■ I, therefore, hold that the patent is wanting in invention.

In addition, if it be assumed that the product after dyeing does present a characteristic surface with the mohair yarn slightly projecting above the cotton, and if it further be assumed that this structure, in itself, apart from the ordinary qualities of the adulterant, somehow achieves a useful and desirable result, I am of the opinion that the patent is anticipated by the Oldroyd, British patent of 1872. The disclosure of that patent is, "In the production of a fabric having its weft and warp of cotton yarn to form the ground, and a warp of yarn made of cow, calf, goat, or other animal hair in mixture or combination with rhea grass or other vegetable fibre to form or produce the face of the fabric, which is raised in loops and curled, forming a curled pile surface similar to the fabric technically known as 'Astrachan.'"

It is interesting to note the manner in which the plaintiff attempted to meet the difficulty presented by the Oldroyd patent, The first part of his testimony seems at first to be inconsistent with what he said after recess but, if read carefully, it may not be so. At any rate, his final position was that the Oldroyd patent disclosed a kind of terry weave, and that it was intended for making Astrachan. Now, he says, in effect, "Astrachan implies a very heavy, loosely twisted yarn, and if you take that kind of yarn and use it in the weave of the Oldroyd patent, the large loose warp threads will curl or tumble in such heavy loops that the mohair will not stand up above the cotton threads, after the dyeing. Hence, what you get will not have the essential characteristic of the patented fabric."

All this might have some validity if the patent were directed or limited to a frisé or even a "closely woven short-looped fabric." The trouble is that the patent covers any and all loop pile fabric, and disclaims application to any particular weave. By its terms it plainly covers terry weave, Astrachan or anything else which is properly a loop pile fabric. In other words, in order to escape anticipation by Oldroyd, the plaintiff is driven to narrow his claims by a limitation which not only is nowhere suggested in the patent but which is excluded by the broad phraseology of the claims and the express disclaimer of the specification.

It may be also noted that there is nothing but the plaintiff's opinion to indicate that the effect of the mohair loops projecting beyond the vegetable fibre threads, as described in claim 4, for example, would not occur in a fabric made according to the Oldroyd patent. The plaintiff says it would not, because the yarn would be too loosely twisted and too thick and heavy, but the only thing the patent says about its yarn is that, "In providing the yarn from which the pile fabric of the present invention is woven, animal and vegetable fibre threads are twisted loosely together." And it nowhere mentions the size or weight of the yarn.

Without further speculation upon the type of fabric which could be produced under the Oldroyd patent, it is plain from the plaintiff's testimony that, if his patented fabric is in any different from that which he says Oldroyd will get, it must be solely because of the weave, the weight of the yarn used and the tightness of the twist—matters not claimed or even suggested.

I therefore hold all of the claims of the patent invalid as anticipated by the Oldroyd patent.

In view of the foregoing, I make no finding upon the question of infringement, except as to claims 2 and 5, which were incidentally discussed. These claims are clearly not infringed even if valid.

Statements of fact in this opinion may be taken as special findings and statements as to the law as conclusions, in compliance with Rule 70½, Equity Rules, 28 U.S.C.A. following section 723.

The bill may be dismissed.